# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 1:23-md-03083-ADB-PGL |
| This Document Relates To: | |
| JUSTIN OKEKE, *on behalf of himself and all others similarly situated*, | DIRECT FILED COMPLAINT & JURY DEMAND PURSUANT TO ORDER REGARDING DIRECT FILING |
| Plaintiff, | CIVIL ACTION NO. |
| v. | |
| PROGRESS SOFTWARE CORPORATION; NUANCE COMMUNICATIONS, INC. | |
| Defendants. | |

Plaintiff Justin Okeke ("Plaintiff"), individually and on behalf of all others similarly situated, defined below, upon personal knowledge of facts pertaining to himself and on information and belief as to all other matters, brings this Class Action Complaint against Nuance Communications, Inc. ("Nuance") and Progress Software Corporation ("Progress") (collectively "Defendants") and, in support thereof, alleges as follows:

## NATURE OF ACTION

1.      This Complaint is being directly filed into this MDL proceeding pursuant to the Court's MDL Order No. 12.

2.      Plaintiff incorporates the allegations contained in the Plaintiffs' Omnibus Set of Additional Pleading Facts (ECF No. 908) in its entirety.

3.     Accordingly, Plaintiff brings this action against Defendants, seeking redress for their unlawful conduct and asserting claims for (i) negligence, (ii) negligence per se, (iii) breach of implied contract, (iv) unjust enrichment, (v) invasion of privacy (public disclosure of private facts), (vi) bailment, (vii) declaratory judgment, as well as for violations of (viii) Massachusetts General Laws.

4.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including, but not limited to, improvements to Defendants' data security systems, future audits, and penetration testers, as well as long-term and adequate credit monitoring services funded by Defendants.

## PARTIES

5.     Plaintiff Justin Okeke is, and at all times mentioned herein was, an individual citizen of the State of North Carolina, residing in Raleigh, North Carolina.

6.     Defendant Progress Software Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business located at 15 Wayside Road, Suite 4, Burlington, Massachusetts 01803. Progress offers the file transfer service MOVEit software, which experienced the Data Breach underlying Plaintiff's claims.

7.     Defendant Nuance Communications, Inc., is a for-profit Delaware corporation with its principal place of business at 1 Wayside Road, Burlington, Massachusetts 01803. Defendant is a citizen of the state of Delaware and the Commonwealth of Massachusetts.

## JURISDICTION

8.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000) and

is a class action in which one or more class members are citizens of states different from Defendants'.

9.      Plaintiff is filing this case in the District of Massachusetts pursuant to the Court's MDL Order No. 12 (Direct Filing Order).

10.      The District of Massachusetts has personal jurisdiction over both Nuance and Progress because each Defendant maintains their principal place of business in this jurisdiction and conducts substantial business in this District. This Court is the proper venue for this case pursuant to 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because a substantial part of the events giving rise to the claims emanated from activities within this District, Defendants maintain their principal places of business in the jurisdiction, and Defendants conduct substantial business in this District.

## FACTUAL ALLEGATIONS

### Defendants' Businesses Requires the Collection and Maintenance of Plaintiff's and Class Members' Private Information

11.      Plaintiff and Class Members reallege and incorporate by reference all paragraphs, from Plaintiffs' Omnibus Set of Additional Pleading Facts (ECF No. 908) as if fully set forth herein.

12.      Defendant Nuance provides artificial intelligence ("AI") software to healthcare providers across the United States and around the world. Nuance technology is used by 90% of hospitals and 10,000 healthcare organizations worldwide, and four out of five healthcare organizations within the United States.[1] The AI technology sold by Nuance includes transcription services, diagnostic analytics, document capture, speech recognition, and more.

---

[1] *Healthcare AI Solutions & Services*, NUANCE, https://perma.cc/6PX5-P77E (last visited June 5, 2024).

13.     Across these organizations, Nuance claims to transmit over 300 million "patient stories" (*e.g.*, radiology reports, clinician documentation of appointments) each year.[2] These "patient stories" inherently involve personal information gathered from those millions of patients.

14.     While administering its healthcare technology services, Nuance receives, maintains, and handles Private Information from its client healthcare providers, which includes, *inter alia*, names, birth dates, medical record numbers, gender, demographic information, information about medical studies received, medical practitioners' names, descriptions of medical services rendered, diagnoses, medication information, health care plan subscriber identification numbers, email addresses, phone numbers, relatives' names, and power of attorneys' names.

15.     As part of Nuance's business operations, Nuance acquires, collects, stores, and utilizes consumers' sensitive personal data, including personal identifying information ("PII")[3] and protected health information ("PHI")[4] (collectively, "Private Information").

---

[2] *Fact Sheet: Nuance Healthcare by the Numbers*, NUANCE (2022), https://perma.cc/RTL2-9LCQ (last visited June 5, 2024).

[3] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[4] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq*., and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 42 U.S.C. § 1320d(6); 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. "Summary of the HIPAA Privacy Rule," DEP'T FOR HEALTH & HUM. SERVS., https://perma.cc/9U8X-5L7E (last accessed June 5, 2024).

16.     Defendant Progress represents itself as "a global supplier of products and services for business applications" that "develops, markets and distributes application development, deployment, integration and management software to business, industry and governments worldwide."[5]

17.     Progress advertises itself as an "experienced, trusted provider of products designed with you, our customers, in mind. With Progress, you can build what you need, deploy where and how you want, empower your customers, then manage it all safely and securely."[6]

18.     Nuance "use[s] software made by a third-party company named Progress Software Corporation ("Progress Software") to safely and securely exchange audit logs pertaining to radiology images among healthcare providers."[6] In other words, Nuances used Progress's secure file transfer software, MOVEit, and stored records on its computer systems. Upon information and belief, Nuance utilizes MOVEit software and on-premises hardware to exchange patient files related to the clinical documentation services provided to its client healthcare providers. By using on-premises MOVEit hardware, Nuance had physical control over the server that was compromised at the time of the Data Breach.

19.     As alleged and incorporated herein, Progress knew its software, MOVEit, was being used by Nuance to transfer sensitive information.

20.     As part of its business operation with respect to its clients in the healthcare industry, Progress acquires, collects, stores, and utilizes consumers' sensitive personal data, including Private Information of its clients' customers, like Plaintiff and Class Members.

21.     Plaintiff and Class Members directly or indirectly entrusted Nuance with their sensitive and confidential Private Information and therefore reasonably expected that Nuance, and

---

[5] Progress, SEC Form 10-K (2003), https://perma.cc/4UMV-5C2R (last accessed June 5, 2024).
[6] *Infra*, n. 31.

by extension, Progress, would safeguard their highly sensitive information and keep their Private Information confidential.

22.     As the business associates of healthcare providers, Defendants knowingly obtain sensitive patient Private Information and have a resulting duty to securely maintain such information in confidence.

23.     As custodians of Plaintiff's and Class Members' Private Information, Nuance and Progress assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

24.     This Private Information was compromised as a result of a security vulnerability in the MOVEit software, as alleged in Plaintiffs' Omnibus Set of Additional Pleading Facts and incorporated and realleged herein. *See* ECF No. 908 (section I(D)).

25.     As a result of Defendants' respective failures to uphold their equitable and legal obligations to protect Plaintiff's and Class Members' Private Information, the Data Breach exposed and harmed 1,225,054 individuals whose Private Information was in Nuance's systems.[7] This information included, but was not limited to name, address, birth date, medical diagnoses, treatments provided, medication dosages, and health insurance information.[8]

26.     Some or all of the healthcare and/or medical information that was compromised and stolen by the unauthorized third party constitutes "protected health information" within the meaning of HIPAA.[9]

---

[7] HEALTHCARE IT NEWS, "Nuance adds 1.2M patients to the MOVEit hack victims list," published September 23, 2023, available here: https://perma.cc/FP5P-9UTU (last accessed June 5, 2024).
[8] https://perma.cc/6QFS-57EL (last accessed June 5, 2024).
[9] *Supra*, n. 4; *see also infra*, n. 31.

**Defendants Misrepresent Their Security Practices**

27.    Defendant Nuance claims it "is reinventing how people connect with technology and each other through AI-powered solutions that are more intelligent and intuitive[]" and that it is "committed to building technology responsibly."[10] Nuance claims "[d]ata privacy and security are among Nuance's highest priorities[]" and "[t]he company has extensive measures in place to protect information entrusted to us."[9]

28.    Nuance expressly recognizes it has a duty to securely maintain individuals' Private Information in confidence. In its Privacy Policy, Nuance states: "We follow generally accepted standards to protect the personal data submitted to us, both during transmission and once it is received."[11] Nuance's HIPAA Privacy Policy further states that "Nuance embraces a holistic approach to securing patient data within our custody."[12] The current Business Associate Agreement (hereafter "BAA") as posted on Nuance's website promise its customers that Nuance will "use appropriate safeguards . . . with respect to electronic protected health information, to prevent use or disclosure of PHI other than as provided for by this BA Agreement."

29.    Similarly, Progress claims to be HIPAA compliant, and claims that it has, among other protocols, "implemented technical and organizational measures to ensure HIPAA compliance and operates in secure computing environments in its corporate offices, development environments, and production cloud products. Progress audits its security solutions and processes annually to maintain SOC2 and HIPAA validation."[13]

---

[10]    *See*  https://perma.cc/A7GM-VMCC  (last accessed  June  5,  2024);  then  *see* https://perma.cc/RK7G-7UQA (last accessed June 5, 2024).

[11] https://perma.cc/Y7FS-QZVT (last accessed June 5, 2024).

[12] *Global Privacy - HIPAA Requirements*, NUANCE, https://perma.cc/DB6G-9LX5 (last visited June 5, 2024).

[13] https://perma.cc/G6HN-ZWJ9 (last accessed June 5, 2024).

**Defendants Owed Legal Obligations to Plaintiff and Class Members**

30.     Nuance owed a non-delegable duty to Plaintiff and Class Members to implement reasonable and adequate security measures to protect their Private Information, including to ensure its third-party vendors had implemented adequately safe and secure policies and practices.

31.     Similarly, as alleged and incorporated, Progress owed a non-delegable duty to Plaintiff and Class Members to identify and remediate vulnerabilities in its MOVEit software and to implement reasonable and adequate security measures to secure and protect Plaintiff's and Class Members' Private Information.[14]

32.     Because Defendants receive, maintain, and handle Private Information from healthcare providers, directly or indirectly, Defendants each qualify as a "business associate" within the meaning of 45 C.F.R. § 160.103 and have therefore entered into Business Associate Agreements with their client healthcare providers and/or clients that handle healthcare data, becoming custodians of patient PHI and owing duties to protect it under HIPAA and the HITECH Act.[15]

33.     Defendants were well aware of their legal obligations.

---

[14] *See* ECF No. 908 (section IV(C)) (describing Progress's legal and equitable duties of which it knew or should have known).

[15] Under HIPAA, a "business associate" is defined as, with respect to a covered entity, a person who: "creates, receives, maintains, or transmits protected health information for a function or activity regulated by [HIPAA], including claims processing or administration, data analysis, processing or administration, utilization review, quality assurance, patient safety activities listed at 42 CFR 3.20, billing, benefit management, practice management and repricing. . . . ." 45 C.F.R. § 160.103(1). *Business Associate*. A business associate includes an entity "that provides data transmission services with respect to protected health information to a covered entity and that requires access on a routine basis to such protected health information." 45 C.F.R. § 160.103(3). As a software that transfers HIPAA protected data contracted with a HIPAA covered entity, Progress is clearly a "business associate," subject to HIPAA, with respect to its relationship and data acquired and stored through its contract with Delta Dental Defendants.

34.     Nuance's status as a business associate is further supported by the up-to-date "HIPAA Business Associate Agreement" as posted on its website, in which Nuance refers to itself as a "Business Associate."[16]

35.     Progress also represents on its website that it "provides [its clients] with a Business Associate Agreement to protect your data and help conform to your business's HIPAA compliance program."[17]

36.     As "business associates" under HIPAA, "the standards, requirements, and implementation specifications adopted under [HIPAA] apply" to both Nuance and Progress. 45 C.F.R. § 160.102(b). For example, "[a] written contract between a covered entity and business associate must . . . [among numerous other requirements] require the business associate to implement appropriate safeguards to prevent unauthorized use or disclosure of the information, including implementing requirements of the HIPAA Security Rule with regard to electronic protected health information . . . ."[18]

37.     In other words, as "business associates" under HIPAA, Defendants are required to comply with the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information"), as well as the Health Information Technology Economic and Clinical Health Act ("HITECH"),[19] as alleged in Plaintiffs' Omnibus Set of Additional Pleading Facts and incorporated as if fully set forth herein. *See* ECF No. 908 (section V(C)(II)) (describing obligations of healthcare defendants as 'covered entities,' applicable with respect to the Security Rule to Business Associates as alleged herein).[20]

---

[16] HIPAA Business Associate Agreement, NUANCE, last modified Feb. 15, 2023, available here: https://perma.cc/F2MT-SS4G (last visited June 5, 2024).
[17] https://perma.cc/PAG9-PYHZ (last accessed June 5, 2024).
[18] *Infra*, n. 22.
[19] *See* 42 U.S.C. § 17921(2) (incorporating "business associate" as defined in 45 C.F.R. § 160.103).
[20] *See also* "Summary of the HIPAA Security Rule," DEP'T FOR HEALTH & HUM. SERVS.,

38.     HIPAA requires business associates, including Defendants to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. §164.102, *et seq*.

39.     As business associates, Nuance and Progress are also required to follow regulations for safeguarding electronic medical information pursuant to the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH"). *See* HITECH Act, Sec. 13400, *et seq*.; 42 U.S. Code § 17931; 42 U.S.C. § 17921; 45 C.F.R. § 160.103.

40.     Both HIPAA and HITECH obligate Nuance and Progress to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive patient Private Information.[21] Specifically, these standards and rules require of business associates comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of Private Information is properly maintained and protected. 42 U.S. Code § 17931 (applying security requirements to business associates and incorporating security requirements into BAAs between business associates and covered entities); *see* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards); 45 C.F.R. § 164.316 (policies and procedures and documentation requirements).

41.     Under a BAA with its clients, a business associate, such as Nuance and Progress, acknowledges that it is subject to requirements under HIPAA, HITECH, and the Final Rule

---

https://perma.cc/J2XB-5TLA (last accessed June 5, 2024).
[21] "The HITECH Act Summary;" https://perma.cc/HSQ6-4942 (last accessed June 5, 2024).

(Omnibus Rule) and agrees to protect member Personal Health Information (PHI) as required under said laws.[22]

42.     The U.S. Department of Health and Human Services further recommends the following data security measures business associates such as Nuance and Progress should implement to protect against some of the more common, and often successful, cyber-attack techniques. According to those guidelines, business associates should:

A.      implement security awareness and training for all workforce members. The training programs should be ongoing, and adaptable to educate the workforce on new and current cybersecurity threats and how to respond;

B.      implement technologies that examine and verify that received emails do not originate from known malicious sites, scan web links or attachments included in emails for potential threats, and impede or deny the introduction of malware that may attempt to access PHI;

C.      mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

D.      implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

---

[22] *See* "Business Associate Contracts," DEP'T FOR HEALTH & HUM. SERVS., https://perma.cc/7828-L5RG (last accessed June 5, 2024); *see id.* for a Sample Business Associate Agreement.

E.       implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[23]

43.     As previously alleged and incorporated, Progress's customers, including Nuance, were required to comply with the FTC guidelines. *Inter alia*, the FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[24] *See* ECF. No. 908 (section V(C)(I)).

44.     Similarly, Progress's business conduct is also governed by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses of failing to use reasonable measures to protect sensitive consumer data, including Private Information. Various FTC publications and orders promulgated pursuant to the FTC Act also form the basis of Progress's duty. *See* ECF. No. 908 (section V(C)(I) applicable to Progress as well). Progress also knew or should have been aware of guidelines and publications by the FTC and other resources regarding cybersecurity risks and best practices.

45.     As incorporated and realleged herein, Nuance and businesses in the healthcare industry knew of these requirements and of industry cybersecurity standards and their obligations to protect Plaintiff's and Class Members' highly-sensitive Private Information. *See* ECF No. 908 (section V).

46.     In addition to the aforementioned and incorporated industry standards, the Center for Internet Security (CIS) has also published clear guidance on the steps businesses that share information with third parties, *e.g.*, "rely on vendors and partners to help manage their data or rely

---

[23] OCR Quarter 1 2022 Cybersecurity Newsletter, U.S. DEP'T HEALTH HUM.SERVS., (Mar. 17, 2022), https://perma.cc/5L25-V4Z4 (last accessed June 5, 2024).
[24] *Start With Security*, FED. TRADE COMM'N ("FTC"), https://perma.cc/W829-XP9N (last visited June 5, 2024).

on third-party infrastructure for core applications or functions," should take to ensure those vendors have appropriate cybersecurity systems and protocols in place, and that their customers' Private Information is adequately safeguarded.[25] Since its formation in 2000, CIS has established applicable industry standards to "help people, businesses, and governments protect themselves against pervasive cyber threats."

47.    As incorporated and realleged herein, Progress knew of its obligations to protect Plaintiff's and Class Members' Private Information, including of industry cybersecurity standards, and could have prevented the Data Breach by following industry standards for secure software development and maintenance. *See* ECF No. 908 (sections III-IV).

48.    For example, as alleged and incorporated, Progress had an obligation to identify and remediate any vulnerabilities in the MOVEit software.[26]

49.    Moreover, although Nuance is not a "covered entity" under HIPAA and thereby does not have the legal obligation to inform individuals affected, Nuance still had disclosure requirements under the Breach Notification Note, 45 C.F.R. Part 164, Subpart D ("Notification in the Case of Breach of Unsecured Protected Health Information"), as described:

> "One often overlooked area of the HIPAA Security Rule in that Business Associate Agreements must stipulate that all security incidents must be reported by a business associate to a covered entity whether they result in a data breach or not (see 45 CFR §164.314(a)(2)(i)). If a security incident *does* result in a breach of unsecured PHI, it must be reported to the covered entity within 60 days of the discovery of a breach. While this is the absolute deadline, business associates must not delay notification unnecessarily. Unnecessarily delaying notifications is a violation of the HIPAA Breach Notification Rule.[27]

---

[25] *Critical Security Controls*, CENTER FOR INTERNET SECURITY, at 12, 42-44 (May 2021), https://perma.cc/R3M4-4KAU (last visited June 5, 2024).

[26] *See* ECF No. 908 (section IV(C)) (describing Progress's legal and equitable duties of which it knew or should have known); these obligations also arise because it is regulated under the terms of a "Business Associate" under HIPAA. 45 C.F.R. § 160.103(1); *supra*, n. 15.

[27] https://perma.cc/M38S-GPQY (last accessed June 5, 2024).

**Defendants Failed to Protect and Satisfy Their Legal Obligations**

50.    Despite Nuance's duty to safeguard Plaintiff's and Class Members' Private Information, Nuance nevertheless employed inadequate data security measures to protect and secure the data with which it was entrusted, resulting in the Data Breach and the subsequent compromise of Plaintiff's and Class Members' Private Information. As described in Plaintiffs' Omnibus Set of Additional Pleading Facts, had Nuance taken its obligations seriously, it would have determined that the MOVEit software was not safe to use. *See* ECF No. 908 (section V(D)).

51.    Similarly, Progress failed to identify and remediate vulnerabilities in its MOVEit software and secure Plaintiff's and Class Members' Private Information despite its duties to do so, although it knew or should have known of the vulnerabilities in its software and that it was obligated to patch them. *See* ECF No. 908 (section IV).

52.    Although Defendants owed a non-delegable duty to Plaintiff and Class Members to implement reasonable and adequate security measures to protect their Private Information, they maintained, stored, disclosed, shared, and/or transferred their Private Information in a negligent and/or reckless manner. In particular, Private Information was maintained on computer systems in a condition vulnerable to cyberattacks.

53.    Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Nuance, and thus, it was on notice that failing to take steps necessary to ensure its vendors, including Defendant Progress, properly safeguarded Plaintiff's and Class Members' Private Information from those risks left the Private Information in a vulnerable condition.

54.    As alleged in this Complaint, as well as more generally in the Plaintiffs' Omnibus Set of Additional Pleading Facts, ECF No. 908 (section V(C)(II), Nuance and Progress, respectively, failed to comply with HIPAA and HITECH, including in the following ways:

A.     Failing to maintain adequate security practices, systems, and protocols to prevent data loss and theft;

B.     Failing to mitigate risks of data breach and implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

C.     Failing to ensure the confidentiality, integrity, and protection of electronic PHI that Nuance and Progress creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1).

D.     Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

E.     Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

F.     Failing to identify and respond to suspected or known security incidents and mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 CFR 164.308(a)(6)(ii);

G.     Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 CFR 164.306(a)(2);

H.     Failing to protect against any reasonably-anticipated uses or disclosures of electronic protected health information that are not permitted under the

privacy rules regarding individually identifiable health information in violation of 45 CFR 164.306(a)(3);

I.  Failing to ensure compliance with HIPAA security standard rules by Defendants' workforce in violation of 45 CFR 164.306(a)(94);

J.  Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 CFR 164.502, *et seq*.; and

K.  Retaining information past a recognized purpose and not deleting it;

L.  Failing to ensure that its third-party vendors had implemented adequately safe and secure policies and practices.

55.  Nuance failed to comply with FTC guidelines and industry standards as well. *See* ECF No. 908 (sections V(C)).

56.  As described throughout and discussed in great detail in the Plaintiffs' Omnibus Set of Additional Pleading Facts, Defendants had exposure and knowledge about the high volume of cyberattacks against the healthcare industry, *i.e.*, businesses that collect and store highly valuable and vulnerable Private Information, and that these attacks are dangerously on the rise and pose substantial risks and enormous financial opportunities for cybercriminals. *See* ECF No. 908 (section II(G)).

57.  Similarly, as alleged, Progress should have known of the vulnerabilities in its software, and by failing to patch them, failed to uphold its obligations to protect Plaintiff and Class Members' Private Information. Moreover, Progress's failure to act as quickly as possible after the breach led to additional losses for Plaintiff and Class Members. *See* ECF. No. 908 (sections IV(D)-(E)).

58.     Progress's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as well as its failure to verify whether it had implemented such measures also constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45 as well as FTC and industry standards and guidelines discussed. *See* ECF No. 908 (sections V(C)) (applicable to Progress as well).

59.     The details of the Data Breach remain in the exclusive control of Defendants. Nuance did not disclose the ways in which it failed to comply with data security regulations and industry standards that made it vulnerable to the Data Breach, by way of its third-party service provider, MOVEit, or otherwise.

60.     However, upon information and belief, Defendants breached their duties and obligations by, in one or more of the following ways: (i) failing to design, test, implement, monitor, and maintain reasonable software and/or network safeguards against foreseeable threats; (ii) failing to design, implement, and maintain reasonable data retention policies; (iii) failing to adequately train staff on data security; (iv) failing to comply with industry-standard data security practices; (v) failing to warn Plaintiff and Class Members of  inadequate data security practices; (vi) failing to encrypt or adequately encrypt the Private Information; and (vii) otherwise failing to secure the software and hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

61.     Additionally, Nuance failed to comply with the Breach Notification Rule when Progress informed Nuance of the breach to its systems on May 30, 2023, and (a) Nuance impermissibly and consequentially exceeded the 60-day limit after inform healthcare providers (covered entities), which was required of them after learning about the "security incident," regardless of whether it had confirmed that there had in fact been a breach of that its own clients'

data was impacted, and (b) after confirming that its own clients' customers' Private Information was stolen, Nuance waited *even more* time to confirm whether individuals' Private Information was impacted, confirmed this on July 10, 2023, and then waited *an additional month* to inform healthcare providers directly of the Breach—until August 8, 2023. Nuance violated the HIPAA Notification Rules in numerous ways. Clearly, not only did Nuance violate the law by failing to inform healthcare providers of the security incident itself, 45 CFR §164.314(a)(2)(i)), Nuance "delay[ed] notification unnecessarily [to healthcare providers] . . . [which in it of itself] is a violation of the HIPAA Breach Notification Rule."[28]

**Nuance Waited Over Four Months to Notify Plaintiff and Class Members After Discovering the Data Breach and Over Two Months to Inform Healthcare Providers of the Security Incident**

62.      As described in Plaintiffs' Omnibus Set of Additional Pleading Facts (ECF No. 908) and realleged herein, Progress's MOVEit software was the target of a catastrophic and devastating successful cyberattack that affected thousands of its clients and compromised the Private Information of millions of their customers, including over 1.2 million individuals in Nuance's computer systems.

63.      The victims of the Data Breach experienced the highly offensive disclosure of their sensitive, personal medical information and personal identifying information ("Private Information").

64.      According to Nuance, the information compromised in the Data Breach includes "name, address, email address, birth date, gender, date(s) of service, service locations, practitioners' names, imaging reports, diagnoses, treatments provided, medication dosages, medical record numbers or other patient identifiers, relative names, power of attorney names,

---

[28] *Supra*, n. 27.

health insurance numbers, diagnostic study identifiers (accession number, study UID) and patient identifiers such as medical record number."[29]

65.     According to the letter Plaintiff and Class Members received —notably, *not* titled "Notice of Data Security Incident" or "Notice of Breach" ("Breach Disclosure Letter" hereafter)[30]

66.     Nuance waited almost four months after Progress first informed it about the data breach before admitting to Plaintiff and Class Members that they were victims of a data breach, finally revealing to them that their highly sensitive, personal data was accessed by an unauthorized third party and compromised. They disclose as follows:

> A.     "On May 31, 2023, Progress Software told [Nuance] about a previously unknown vulnerability in their software that allowed an unauthorized third party to take information from the MOVEit Transfer software."
>
> B.     "[Nuance's] analysis of the MOVEit Transfer environment found that the unauthorized third party stole data between May 28 and May 29, 2023."
>
> C.     "On July 10, 2023, Nuance confirmed that as part of [its] investigation that, unfortunately, a limited amount of your personal information within audit logs was affected by the Progress Software incident."
>
> D.     "After gathering all relevant information, [Nuance] told your healthcare provider about this incident on August 8, 2023."

67.     Nuance did not start notifying consumers until September 22, 2023, according to the Maine Attorney General's website of Data Breach Notifications.[31] This is confirmed by the date on at least some of the letters sent to Class Members, including Plaintiff's.

---

[29] *Supra*, n. 8.
[30] *See infra*, n. 31.
[31] "Nuance Notice Template (SSN)", Data Breach Notifications, Office of the Maine Attorney General, available here: https://perma.cc/HHX3-UR6R (last accessed June 5, 2024).

68.     In other words, not only did Nuance waited over *four months* after learning about the unauthorized activity on the MOVEit Platform, but Nuance also waited *six weeks* after it confirmed the exact individuals' data that had been "stolen" before it revealed this crucial information to its customers and suggested that they start taking precautions to protect their identities, *e.g.*, merely review their credit reports.

69.     Notably, the letter sent to the Maine Attorney General's office stated in the body of the letter, in the section, "What Can You Do?" that Nuance would provide 24 months of free credit monitoring through Equifax's Credit Watch Gold, but the letter sent to Plaintiff and Class Members had no offer of free credit monitoring. Instead, it merely "[e]nclosed with this letter . . . some steps you can take to protect your information[,]" without indicating that Nuance itself was providing any services or remediation. Additionally, 24 months of credit monitoring is wholly inadequate, as Plaintiff and Class members face risks of identity theft for their entire lifetime.

70.     When Nuance finally sent notice to its customers about the Data Breach, it deliberately underplayed the Data Breach's severity and obfuscated the nature of the Data Breach. For example, the Breach Disclosure Letter fails to explain how the breach occurred (what security weakness was exploited), what exact data elements of each affected individual were compromised, who the Data Breach was perpetrated by, and the extent to which those data elements were compromised.

71.     In the Breach Disclosure Letter, Nuance also claims that "[d]ata privacy and security are among our highest priorities, and we have extensive measures in place to protect information entrusted to us." It includes that it "worked with cybersecurity experts and legal counsel" but provides no information, in violation again of the Breach Notification Rule, and it does not specify how its steps actually mitigate the harms caused by the Data Breach or describe

how these measures will prevent further breaches nor strengthen its ability to protect Plaintiff's and Class Members' Private Information from future unauthorized disclosure, as required by HIPPA, 45 CFR § 164.404. Nuance does not even provide that it *improved* security measures after the breach. It offers *zero* indication that it even changed its security practices.

72.     Nuance does not offer any assurances or indication that these measures are reasonable or adequate to safeguard and protect Plaintiff's and Class Members' Private Information in the future or if they are vulnerable to new attacks.

73.     In other words, Nuance shifted the burden to Plaintiff and Class Members to remediate their own harms and to be responsible for preventing future harms.

74.     These risks posed to Plaintiff and Class Members are even more pronounced given the extended amount of time that lapsed between when the Data Breach occurred, when Defendants reportedly determined Plaintiff's and Class Members' Private Information was compromised, and when Defendants actually notified Plaintiff and Class Members about the Data Breach.

**Plaintiff and Class Members Suffered Serious Harms**

75.     As alleged and incorporated herein, as victims of cybercriminal data breach, Plaintiff and Class Members face immediate and significant harm. *See* ECF No. 908 (sections II(E)-(I)).

76.     As alleged and incorporated herein, Plaintiff and Class Members suffered injuries in numerous ways and are at risk of future injuries for the rest of their lives. *See* ECF No. 908 (section II(I)).

77.     As a direct and proximate result of Defendants' collective wrongful actions and inaction and the resulting Data Breach, Plaintiff and Class Members have already been harmed by the fraudulent misuse of their Private Information, and have been placed at an imminent,

immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family to attempt to mitigate both the actual and potential impact of the Data Breach on their lives. Such mitigatory actions include, *inter alia*, closely reviewing and monitoring their credit reports and accounts for unauthorized activity; investigating suspicious, unauthorized activity in their financial accounts or credit; placing "freezes" and "alerts" with credit reporting agencies; contacting their financial institutions; reversing charges; closing or modifying financial accounts; sorting through dozens of phishing and spam email, text, and phone communications. This time has been lost forever and cannot be recaptured.

78.     Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class Members' Private Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

A.     theft and misuse of their personal and financial information;

B.     the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and misused via the sale of Plaintiff's and Class Members' information on the Internet's black market;

C.     the untimely and inadequate notification of the Data Breach;

D.     the improper disclosure of their Private Information;

E.     loss of privacy;

F.   ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

G.   ascertainable losses in the form of deprivation of the value of their Private Information, for which there is a well-established national and international market;

H.   the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and suffering the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach; and

I.   nominal damages

79.   While Plaintiff's and Class Members' Private Information has been stolen, Defendants continue to hold Plaintiff's and Class Members' Private Information. Particularly because Defendants have demonstrated an inability to prevent a breach or stop it from continuing even after being detected, Plaintiff and Class Members have an undeniable interest in ensuring that their Private Information is secure, remains secure, is properly and promptly destroyed, and is not subject to further theft.

80.   Plaintiff and Class Members have suffered from the unauthorized disclosure of their Private Information. The disclosure of their protected health information ("PHI") and Social Security Numbers, in particular, is highly offensive due to the sensitivity of the private and

personal data and is severely consequential, due to the various harmful uses of that Private Information that identity thieves capitalize on. *See* ECF No. 908 (section II(F)).

Plaintiff Okeke's Experience

81.     Plaintiff Justin Okeke is, and at all times mentioned herein was, an individual citizen of the State of North Carolina, residing in Raleigh, North Carolina.

82.     Plaintiff used at least one healthcare provider that contracted with Nuance and provided Nuance with his Private Information. Plaintiff was required to provide his Private Information as a condition of receiving healthcare services.

83.     Plaintiff Okeke had the reasonable expectation and understanding that his healthcare provider, and therefore, its third-party vendors, including Defendants, would take—*at minimum*—industry standard precautions to protect, maintain, and safeguard that highly sensitive information from unauthorized users or disclosure, and would timely notify him of any data security incidents. Plaintiff Okeke would not have entrusted his Private Information had he known that Defendants would not take reasonable steps to safeguard his information.

84.     Plaintiff Okeke received a letter from "Nuance Communications, Inc.," dated September 22, 2023, concerning the Data Breach. The letter stated that cybercriminals exploited a security vulnerability within the systems of one of its third-party vendors, Progress, and that unauthorized actors accessed or acquired the data.

85.     The Breach Disclosure Letter informed Plaintiff that unauthorized parties "stole data between May 28 and May 29, 2023," including that of Plaintiff, however, ambiguously provided that "[t]he personal information involved may have included your name and details about

radiology studies you received, including a description of date of the study, date of service, provider and facility name, and study identifiers."[32]

86.     Since the Data Breach, Plaintiff has experienced fraudulent and suspicious activity, including the discovery while searching for car insurance that a person whose name he does not recognize was listed as a resident and possible driver at his home.

87.     Upon information and belief, Plaintiff's unencrypted Private Information was viewed by unauthorized persons, as evidenced by the fraudulent activity he has experienced.

88.     The disclosure of his protected health information (PHI), particularly radiology studies that may expose medical conditions, is highly offensive because of the intensely personal nature of one's personal health and medical related information and has caused him to experience anxiety and increased concerns for the loss of his privacy and highly sensitive Private Information, as well as anxiety over the impact of cybercriminals accessing and using his Private Information because it is now in unknown hands, putting him at grave risk of identity theft presently and ongoing, including fraud affecting his credit.

89.     Plaintiff Okeke values his privacy and is very careful about storing and sharing sensitive Private Information. Plaintiff would not have entrusted his Private Information to any party with lax and inadequate security measures and protections, including Nuance or Progress.

90.     Plaintiff Okeke has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in both Nuance's and Progress's possession, is protected and safeguarded from future breaches.

91.     As a direct and proximate result of the Data Breach, Plaintiff Okeke has made reasonable efforts to mitigate the impact of the Data Breach, including by closely monitoring his

---

[32] Ex. A.

financial accounts for fraudulent, suspicious, unauthorized activity to reduce the risk of future identity theft and fraud— a practice that Plaintiff Okeke will need to continue indefinitely to protect against and/or remedy fraud and identity theft.

92.     To date, as a result of the Data Breach, Plaintiff Okeke has spent several hours researching the details of the Data Breach.

93.     Had Nuance not delayed in notifying Plaintiff about the Data Breach, he could have taken additional precautions earlier on to protect his identity and mitigate the harms of the Data Breach.

94.     As a result of the Data Breach, Plaintiff Okeke anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and continues to face risks of fraud and identity theft that will last for his lifetime.

95.     Plaintiff Okeke suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach.

96.     Given the highly sensitive nature of the information stolen and its subsequent dissemination to unauthorized parties, Plaintiff has already suffered injury in the form of damages and diminution in the value of his Private Information— a form of intangible property that Plaintiff cannot recover. Plaintiff remains at a substantial and imminent risk of future harm.

## CLASS ALLEGATIONS

97.     Plaintiff brings this class action behalf of himself and on behalf of the Nationwide Class, defined below. Plaintiff seeks certification under Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and, as appropriate, (c)(4) of the following Classes:

**<u>Nuance Nationwide Class</u>**

All persons in the United States whose Private Information on Nuance's platform and/or systems was compromised, copied, stolen, and/or exposed in the MOVEit Data Breach.

**Progress Nationwide Class**

All persons in the United States whose Private Information was compromised in the MOVEit Data Breach.

98.     These definitions may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

99.     The Nuance Nationwide Class asserts claims against Nuance for: negligence (Count I); negligence *per se* (Count II); breach of implied contract (Count III); unjust enrichment, in the alternative (Count IV); invasion of privacy (public disclosure of private facts) (Count V); bailment (Count VI); declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* (Count VII); Massachusetts General Laws Chapter 93A (Count VIII).

100.    The Progress Nationwide Class asserts claims against Progress for: negligence (Count I); negligence *per se* (Count II); breach of implied contract (Count III); unjust enrichment, in the alternative (Count VI); invasion of privacy (public disclosure of private facts) (Count V); bailment (Count VI); for declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* (Count VII); Massachusetts General Laws Chapter 93A (Count VIII).

101.    Pursuant to Fed. R. Civ. P. 23(a), (b)(3), and (c)(4), Plaintiff brings this action on behalf of himself and on behalf of the Nuance North Carolina Subclass and Progress North Carolina Subclass (collectively, "North Carolina Subclasses"), defined below, and seek certification of state common law and statutory claims in the alternative to the nationwide claims.

**Nuance North Carolina Subclass**

All persons residing in North Carolina whose Private Information was compromised on Nuance's platform and/or systems in the MOVEit Data Breach.

**Progress North Carolina Subclass**

All persons residing in North Carolina whose Private Information was compromised in the MOVEit Data Breach.

102.    Excluded from the foregoing classes are: (1) the judges presiding over the action; (2) the Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former officers and directors; (3) persons who properly opt out; and (4) the successors or assigns of any such excluded persons.

103.    **Numerosity**: Class members are so numerous that their individual joinder is impracticable, as the proposed Progress Nationwide Class includes at least 60 million members, and the proposed Nuance Nationwide Class includes at least 1,225,000 members—who are geographically dispersed. The North Carolina State Subclasses are also so numerous that their individual joinder is impracticable, each containing thousands of members.

104.    **Typicality**: Plaintiff's claims are typical of Class Members' claims. Plaintiff and all Class Members were injured through Defendants' uniform misconduct, and Plaintiff's claims are identical to the claims of the Class Members they seek to represent.

105.    **Adequacy**: Plaintiff's interests are aligned with those of the Class Members he seeks to represent, and Plaintiff has retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiff and his counsel intend to prosecute this action vigorously. All Class Members' interests are well-represented by Plaintiff and undersigned counsel.

106.    **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other Class Members' claims. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not

impossible for Class Members individually to effectively redress Defendants' wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

107.    **Commonality and Predominance:** The following questions common to all Class Members predominate over any potential questions affecting individual Class Members:

A.      Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' Private Information from unauthorized access and disclosure;

B.      Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' Private Information;

C.      Whether Defendants breached their duties to protect Plaintiff's and Class Members' Private Information;

D.      Whether Defendants violated the statutes alleged herein;

E.      Whether Plaintiff and all other Class Members are entitled to damages and the measure of such damages and relief.

108.    Given that Defendants engaged in a common course of conduct as to Plaintiff and all other Class Members, similar or identical injuries and common law violations are involved, and common questions outweigh any potential individual questions.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Nuance Nationwide Class, or, in the alternative Nuance North Carolina Subclass; as well as on behalf of Plaintiff and the Progress Nationwide Class, or in the alternative, Progress North Carolina Subclass, against Nuance and Progress (collectively, "Defendants"))**

109.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein, including the Plaintiffs' Omnibus Set of Additional Pleading Facts. ECF No. 908.

110.    Defendants gathered and stored the Private Information of Plaintiff and Class Members as part of their businesses, which affects commerce.

111.    Defendants had full knowledge of the high monetary value and sensitivity of their Private Information and of the types of harm that Plaintiff and Class Members could and would suffer if their Private Information was wrongfully disclosed.

112.    By assuming the responsibility to collect and store this data, as well as sharing it and utilizing it to derive business value and commercial profits, Defendants owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information and keep it from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

113.    Nuance owed a duty to Plaintiff and Class Members to select a software file transfer service that employed reasonable data security measures to protect their customers' Private Information.

114.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

115.     Plaintiff and Class Members have no ability to protect their Private Information that was or remains in Defendants' possession.

116.     Defendants were in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach and to prevent the Data Breach altogether.

117.     The risk that unauthorized persons would attempt to gain access to Plaintiff's and Class Members' Private Information and misuse it was foreseeable to all Defendants. They had a common law duty to prevent foreseeable harm to others because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendants. By collecting, receiving, storing, and using Private Information that is routinely targeted by criminals for unauthorized access, they were obligated to act with reasonable care to protect against these foreseeable threats.

118.     Given that Progress collects, stores, and uses vast amounts of Private Information and given the high market value of this data, it was inevitable that unauthorized cybercriminals would at some point try to access Progress's computer networks. Defendants knew, or should have known, the importance of exercising reasonable care in handling the Private Information entrusted to them.

119.     Defendants knew or should have known that their data security was insufficient to guard against those attacks, particularly, given the size of their databases, the sensitivity of the Private Information therein, and rise of cyberattacks against healthcare organizations, they were a prime target.

120.     Defendants' Privacy Policies acknowledge their duties to adequately protect the personal and medical information of Plaintiff and Class Members in accordance with the law.

Progress's Privacy Policies, as their business pertains to protected health information, acknowledge their legal obligations under HIPAA as well as their duty to protect and prevent from disclosure all other data they collect and store.

121.    Nuance had and continues to have duties to adequately disclose that Plaintiff's and Class Members' Private Information within its possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was, and continues to be, necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and fraudulent use of their Private Information by third parties.

122.    Defendants breached their duties owed to Plaintiff and Class Members and thus were negligent. Defendants breached these duties by, among other things: (a) mismanaging their systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of Private Information; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to detect the breach at the time it began or within a reasonable time thereafter; and (f) failing to follow their own policies and practices, as published to their clients.

123.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach and harms suffered.

124.    Defendants' respective negligent conduct is ongoing, in that Plaintiff's and Class Members' Private Information remains in Defendants' possession in an unsafe and insecure manner.

125.    Plaintiff and Class Members are entitled to injunctive relief requiring Defendants to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
**(On Behalf of Plaintiff and the Nuance Nationwide Class, or, in the alternative Nuance North Carolina Subclass; as well as on behalf of Plaintiff and the Progress Nationwide Class, or in the alternative, Progress North Carolina Subclass, against Nuance and Progress (collectively, "Defendants"))**

126.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

127.    Defendants had duties arising under HIPAA, the HIPAA Privacy Rule and Security Rule, HITECH, and the FTC Act to protect Plaintiff's and Class Members' Private Information.

128.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect sensitive consumer data, including Private Information.

129.    Various FTC publications and orders promulgated pursuant to the FTC Act also form the basis of Defendants' duty.

130.    Defendants breached their duties, pursuant to the FTC Act and other applicable standards, and thus were negligent by failing to implement fair, reasonable, or appropriate

computer systems and data security practices that complied with applicable industry standards to safeguard Plaintiff's and Class Members' Private Information as part of their business practices.

131.    Defendants' duty to use reasonable security measures under HIPAA as both business associates, respectively, required Defendants to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Under HIPAA, Defendants owed a duty to "reasonably safeguard protected health information from any intentional or unintentional use or disclosure." 45 C.F.R. § 164.530(c)(2). Some or all of the healthcare and/or medical information that was compromised constitutes "protected health information" within the meaning of HIPAA. 42 U.S.C. § 1320d(6); 45 C.F.R. § 160.103.

132.    Defendants' specific negligent acts and omissions, resulting in failure to comply with HIPAA regulations include, but are not limited to, the following: (i) failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information; (ii) failing to adequately monitor the security of their networks and systems; (iii) allowing unauthorized access to Class Members' Private Information; (iv) failing to detect in a timely manner that Class Members' Private Information had been compromised; (v) failing to remove former employees' Private Information they were no longer required to retain pursuant to regulations; and (vi) failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

133.    Defendants' violations of HIPAA, the HIPAA Security Rule, HITECH, and Section 5 of the FTC Act (and similar state statutes) independently constitute negligence *per se*.

134.    Plaintiff and Class Members are consumers within the class of persons that HIPAA, HITECH, and Section 5 of the FTC Act were intended to protect.

135.    The harms that have occurred are the type of harm HIPAA, HITECH, and the FTC Act were intended to guard against.

136.    The FTC has pursued enforcement actions against businesses and healthcare entities that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harms as those suffered by Plaintiff and the Class.

137.    In addition, dozens of states have implemented data security and consumer protection statutes, reflecting laws and policies to safeguard Private Information. Defendants had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class Members' Private Information.

138.    Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored, the high frequency of cyber-attacks that target the exact type of Private Information targeted here, and the foreseeable consequences of a data breach of that nature.

139.    Plaintiff and Class Members were foreseeable victims of Defendants' violations of HIPAA, HITECH, and the FTC Act, and state data security and consumer protection statutes. Defendants knew or should have known that their failure to implement reasonable data security measures to protect and safeguard Plaintiff's and Class Members' Private Information would cause damage to Plaintiff and the Class.

140.    Plaintiff and Class Members were foreseeable victims of Defendants' negligent acts and omissions. Defendants knew or should have known that their failure to implement reasonable

data security measures to protect and safeguard Plaintiff's and Class Members' Private Information would cause damage to Plaintiff and the Class.

141.   Defendants violated their own policies by disclosing Plaintiff's and the Class Members' PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; and by failing to maintain the confidentiality of Plaintiff's and the Class Members' records.

142.   Defendants violated their "Business Associate Agreements," under which they agreed to protect customers', including Plaintiff's and Class Members', PHI and were subject to privacy and security safeguard requirements and standards established by HIPAA, HITECH, and the Omnibus Rule.

143.   But for Defendants' violations of the applicable laws and regulations, Plaintiff's and Class Members' Private Information would not have been accessed by unauthorized parties.

144.   As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer injuries, including, but not limited to: (i) theft of their Private Information; (ii) costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts; (iii) costs associated with purchasing credit monitoring and identity theft protection services; (iv) lowered credit scores resulting from credit inquiries following fraudulent activities; (v) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts; (vi) the imminent and certainly impending injury flowing from the increased risk of

potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals; (vii) damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendants with the mutual understanding that they would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; (viii) continued and certainly increased risk of exposure to hackers and thieves of their Private Information, and additional unauthorized viewing of their Private Information that was already hacked in the Data Breach; (ix) loss of their privacy and confidentiality in their Private Information; (x) the erosion of the essential and confidential relationship with their healthcare providers that trusted, directly or indirectly, Defendants that exposed them to these privacy risks; (xi) loss of personal time and opportunity costs to monitor and/or remedy harms caused by theft of their Private Information; (xii); an increase in spam calls, texts, and/or emails; and (xiii) the continued and certainly increased risk to their Private Information.

145.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

146.    Finally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Nuance Nationwide Class, or, in the alternative Nuance North Carolina Subclass; as well as on behalf of Plaintiff and the Progress Nationwide Class, or in the alternative, Progress North Carolina Subclass, against Nuance and Progress (collectively, "Defendants"))**

147.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

148.    Defendants acquired and maintained the Private Information of Plaintiff and the Class that they received either directly or from their healthcare providers.

149.    When Plaintiff and Class Members paid money and provided their Private Information to their doctors and/or healthcare providers, either directly or indirectly, in exchange for goods or services, they entered into implied contracts with their doctors and/or healthcare professionals, their business associates, revenue service providers, and file transfer software providers, including Defendants.

150.    Plaintiff and Class Members entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

151.    Plaintiff and the Class were required to deliver their Private Information to Defendants as part of the process of obtaining services provided by Defendants.

152.    In delivering, directly or indirectly, their Private Information to Defendants and paying for healthcare services, Plaintiff and Class Members intended and understood that all business associates and providers of their healthcare, including Defendants, would adequately safeguard the data as part of that service.

153.    Defendant Nuance solicited, offered, and invited Class Members to provide their Private Information as part of Defendant Nuance's regular business practices. Plaintiff and Class

Members accepted Nuance's offers and provided their Private Information to Defendant Nuance, or, alternatively, provided their information to doctors or other healthcare professionals, who then provided it to Defendant Nuance. In turn, Defendant Nuance provided that same Private Information to Progress in the course of using Progress's MOVEit software.

154.    Alternatively, Plaintiff and Class Members were the intended beneficiaries of data protection agreements entered into between Defendants and healthcare providers.

155.    The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

156.    Implicit in these agreements between Plaintiff and Class Members and Defendants were Defendants' obligation to: (a) take reasonable steps to safeguard that Private Information, including through proper vetting of third party vendors to whom Private Information is provided; (b) prevent unauthorized disclosure of the Private Information; (c) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information; (d) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses; and (e) retain or allow third parties to retain Private Information only under conditions that kept such information secure and confidential.

157.    Defendants breached the implied contracts made with Plaintiff and the Class by failing to safeguard and protect their Private Information, including by entrusting the Private Information to a vendor that fails to safeguard Private Information, by failing to delete the Private Information of Plaintiff and the Class or requiring vendors to delete information once the relationship ended, and in the case of Nuance, failing to provide accurate notice to Plaintiff and

the Class that their Private Information was compromised as a result of the Data Breach so that they could take prompt and adequate precautions to mitigate the risks caused by the Data Breach.

158.    Plaintiff and Class Members (or their doctors and healthcare providers) would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

159.    Plaintiff and Class Members therefore did not receive the benefit of the bargain, because they provided their Private Information in exchange for an implied agreement with Defendants to keep it safe and secure, within its own shared computer systems or in connection with providing the Private Information to a third-party vendor.

160.    Defendants recognized that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and Class Members (or their doctors and healthcare providers).

161.    Plaintiff and Class Members (or their doctors and healthcare providers) fully performed their obligations under the implied contracts with Defendants.

162.    Defendants breached the implied contracts with Plaintiff and Class Members (or their doctors and healthcare providers) by failing to take reasonable measures to safeguard their Private Information as described herein.

163.    Defendants' conduct and lax security unfairly interfered with Plaintiff's and Class Members' rights to receive the full benefit of their contracts.

164.    Had Defendants disclosed to Plaintiff and Class Members (or their healthcare providers) that they did not have security practices to secure sensitive data, including adequate policies to verify the security of its third-party vendors or business associates, Plaintiff and Class Members would not have provided their Private Information to Defendants, and thus would not have entered into these implied contracts that Defendants breached.

165.     As a direct and proximate result of Defendants' breaches, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

166.     Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

167.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data monitoring procedures; (ii) evaluate, audit, and improve their processes for vetting third party vendors and the selection processes for vendors to which Defendants provide sensitive Private Information; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) immediately provide or continue providing adequate credit monitoring to all Class Members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nuance Nationwide Class, or, in the alternative Nuance North Carolina Subclass; as well as on behalf of Plaintiff and the Progress Nationwide Class, or in the alternative, Progress North Carolina Subclass, against Nuance and Progress (collectively, "Defendants"))**

168.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

169.     Plaintiff and Class Members bring this Count in the alternative to their breach of implied contract claim against Defendants (Count III).

170.     Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including from money they make based upon protecting Plaintiff's and Class Members' Private Information.

171.     There is a direct nexus between money paid to Defendants and the requirement that Defendants keep Plaintiff's and Class Members' Private Information confidential and protected.

172.    Plaintiff and Class Members paid Defendants and/or healthcare providers a certain sum of money, which was used to fund data security via contracts with Defendants.

173.    As such, a portion of the payments made by or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

174.    Protecting the Private Information of Plaintiff and Class Members is integral to Defendants' businesses. Without their data, Defendant Nuance would be unable to provide the services to hospital and healthcare providers comprising Defendant Nuance's core business, and Defendant Progress would be unable to provide the software services comprising Defendant Progress's core business.

175.    Plaintiff's and Class Members' data and Private Information has monetary value.

176.    Plaintiff and Class Members directly and indirectly conferred a monetary benefit on Defendants. They indirectly conferred a monetary benefit on Defendants by purchasing goods and/or services from entities that contracted with Defendants, and from which Defendants received compensation to protect certain data. Plaintiff and Class Members directly conferred a monetary benefit on Defendants by supplying Private Information, which has value, from which value Defendants derive their business value, and which should have been protected with adequate data security.

177.    Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

178.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failures to provide the requisite security.

179.    Defendants acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

180.    Defendants would be unable to engage in their regular course of business without that Private Information and accepted the monetary benefits Plaintiff and Class Members provided.

181.    Acceptance of the benefit under the facts and circumstances outlined above make it inequitable for Defendants to retain that benefit without payment of the value thereof. Specifically, Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite data security.

182.    Defendants failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

183.    Because Defendants failed to implement appropriate data management and security measures, under the principles of equity and good conscience, it would be unjust if Defendants were permitted to retain the monetary benefit belonging to Plaintiff and Class Members.

184.    Defendants acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

185.    If Plaintiff and Class Members had known that Defendants had not secured their Private Information, they would not have agreed to provide, directly or indirectly, their Private Information to Defendants.

186.    Had Plaintiff and Class Members known that Defendants did not and would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would not have entrusted Defendants, directly or indirectly, with their Private Information.

187.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information and loss of its value; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect

Private Information in their continued possession; (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; (viii) emotional distress, anxiety, and inconvenience; (ix) irreparable breach of confidence in their healthcare providers.

188.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm. It would be inequitable for the Defendants to retain the benefits without paying fair value for them.

189.     Plaintiff and Class Members are entitled to restitution and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct, as well as return of their sensitive Private Information and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

190.     Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**INVASION OF PRIVACY (PUBLIC DISCLOSURE OF PRIVATE FACTS)**
**(On Behalf of Plaintiff and the Nuance Nationwide Class, or, in the alternative Nuance North Carolina Subclass; as well as on behalf of Plaintiff and the Progress Nationwide Class, or in the alternative, Progress North Carolina Subclass, against Nuance and Progress (collectively, "Defendants"))**

191.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

192.    Plaintiff and Class Members reasonably expected that the highly personal, sensitive Private Information entrusted to Defendants, directly or indirectly, would be kept private, confidential, and secure and would not be disclosed to any unauthorized third party or for any improper purpose.

193.    Defendants unlawfully invaded the privacy rights of Plaintiff and Class Members by:

A.    Failing to adequately secure their sensitive Private Information from disclosure to unauthorized third parties or for improper purposes;

B.    Enabling the disclosure of personal and sensitive facts and information about them in a manner highly offensive to a reasonable person; and

C.    Enabling the disclosure of their personal and sensitive Private Information without their informed, voluntary, affirmative, and clear consent.

194.    Plaintiff's and Class Members' Private Information, such as health information, social security numbers, and other matters concerning their private lives, which was publicized due to the Data Breach, was highly sensitive, private, confidential, and of no general public interest, and a reasonable person would consider its publication highly offensive and egregious.

195.    A reasonable person would find it highly offensive that Defendants, having collected Plaintiff's and Class Members' sensitive Private Information, directly or indirectly, in a commercial transaction, failed to protect such Private Information from unauthorized disclosure to third parties.

196.    In failing to adequately protect Plaintiff's and Class Members' sensitive Private Information, Defendants acted in reckless disregard of their privacy rights. Defendants knew or should have known that their ineffective security measures are highly offensive to a reasonable

person in Plaintiff's and Class Members' position given the highly sensitive nature of the data they collect, store, transfer, and use. Defendants knew or should have known of the risks of failing to implement adequate data security practices, too, and the foreseeability and offensiveness of such disclosures.

197.    Defendants violated Plaintiff's and Class Members' right to privacy under the common law.

198.    Defendants' unlawful invasions of privacy damaged Plaintiff and Class Members. As a direct and proximate result of Defendants' unlawful invasion of privacy and public disclosure of private facts, Plaintiff and Class Members' reasonable expectations of privacy were frustrated and defeated. Plaintiff and Class Members are at a current and ongoing risk of identity theft and sustained compensatory damages including: (a) invasion of privacy; (b) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out-of-pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their Private Information; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their Private Information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

199.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach and these invasions of privacy.

200.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### COUNT VI
### BAILMENT
**(On Behalf of Plaintiff and the Nuance Nationwide Class, or, in the alternative Nuance North Carolina Subclass; as well as on behalf of Plaintiff and the Progress Nationwide Class, or in the alternative, Progress North Carolina Subclass, against Nuance and Progress (collectively, "Defendants"))**

201.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

202.    Plaintiff and Class Members provided Private Information to Defendants, and Defendants were under a duty to keep that information private and confidential.

203.    Defendants received this information from Plaintiff and Class Members either directly or through their healthcare providers and their business associates under a Business Associate Agreement.

204.    Plaintiff's and Class Members' Private Information is personal property and was conveyed to Defendants for the certain purpose of keeping the information private and confidential.

205.    Plaintiff's and Class Members' Private Information has value and is highly prized by hackers and criminals. Defendants were aware of the risks they took when accepting their Private Information for safeguarding and assumed the risk voluntarily.

206.    Once Defendants accepted Plaintiff's and Class Members' Private Information, they were in the exclusive possession of that information, and neither Plaintiff nor Class Members

could control that information once it was within the possession, custody, and control of Defendants.

207.    Defendants did not safeguard Plaintiff's or Class Members' Private Information when they failed to adopt and enforce adequate security safeguards to prevent the known risk of a cyberattack.

208.    Defendants' failure to safeguard Plaintiff's and Class Members' Private Information resulted in that information being accessed or obtained by third-party cybercriminals.

209.    As a result of Defendants' failure to keep Plaintiff's and Class Members' Private Information secure, Plaintiff and Class Members suffered injury, for which compensation—including nominal damages and compensatory damages—are appropriate.

## COUNT VII
### DECLARATORY JUDGMENT ACT
### 28 U.S.C. §§ 2201, *et seq.*
**(On Behalf of Plaintiff and the Nuance Nationwide Class, or, in the alternative Nuance North Carolina Subclass; as well as on behalf of Plaintiff and the Progress Nationwide Class, or in the alternative, Progress North Carolina Subclass, against Nuance and Progress (collectively, "Defendants"))**

210.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

211.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

212.    Defendants owed a duty of care to Plaintiff and Class Members, which required them to adequately monitor and safeguard Plaintiff's and Class Members' Private Information.

213.    Defendants still possesses the Private Information belonging to Plaintiff and Class Members.

214.    Plaintiff and Class Members allege that Defendants' data security measures remain inadequate.

215.    Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

216.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

217.    Defendants owe a legal duty to secure Plaintiff's and Class Members' Private Information under the common law, HIPAA, the FTCA, HIPAA, the HITECH Act, as set forth herein;

218.    Defendants' existing data monitoring measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect individuals' Private Information; and

219.    Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class Members' Private Information.

220.    This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect members' Private Information, as described in the Prayer for Relief.

221.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach of Progress's or Nuance's systems. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class Members will not have an adequate remedy at law because many

of the resulting injuries are not readily quantifiable, and they will be forced to bring multiple lawsuits to rectify the same conduct.

222.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs at Progress or at Nuance, Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

223.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach of Defendants' systems and network, thus preventing future injury to Plaintiff and Class Members whose Private Information would be further compromised.

## COUNT VIII
## MASSACHUSETTS GENERAL LAWS CHAPTER 93A
### M.G.L. ch. 93A §§ 2 and 9
**(On Behalf of Plaintiff, the Nuance Nationwide Class, and the Progress Nationwide Class (collectively, "Class Members") against Nuance and Progress (collectively, "Defendants"))**

224.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

225.    M.G.L. ch. 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." M.G.L. ch. 93A § 9 permits any consumer injured by a violation of M.G.L. ch. 93A § 2 to bring a civil action, including a class action, for damages and injunctive relief.

226.    Plaintiff alleges Defendants committed unfair business acts and/or practices in violation of M.G.L. ch. 93A §§ 2 and 9.

227.    Defendants knew or should have known of the inherent risk of experiencing a data breach if they failed to maintain adequate systems and processes for keeping Plaintiff's and Class Members' Private Information safe and secure. Only Defendants were in a position to ensure that their systems were sufficient to protect against harms to Plaintiff and the Class resulting from a data security incident such as the Data Breach; instead, they failed to implement such safeguards.

228.    Defendants' conduct, respectively, also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendants' misconduct included failing to adopt, implement, and maintain the systems, policies, and procedures necessary to prevent the Data Breach.

229.    Defendants acknowledge their conduct created actual harm to Plaintiff and Class Members because Defendants instructed them to monitor their accounts for fraudulent conduct and identity theft.

230.    Defendants knew, or should have known, of the risks inherent in disclosing, collecting, storing, accessing, and transmitting Private Information and the importance of adequate security because of, *inter alia*, the prevalence of data breaches.

231.    Defendants failed to adopt, implement, and maintain fair, reasonable, or adequate security measures to safeguard Plaintiff's and Class Members' Private Information, failed to recognize in a timely manner the Data Breach, and failed to notify Plaintiff and Class Members in a timely manner that their Private Information was accessed in the Data Breach.

232.    These acts and practices are unfair in material respects, offend public policy, are immoral, unethical, oppressive, and unscrupulous and violate 201 CMR 17.00 and M.G.L. ch. 93A § 2.

233.     As a direct and proximate result of Defendants' unfair acts and practices, Plaintiff and Class Members have suffered injury and/or will suffer injury and damages, including but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and/or fraudulent use of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of Defendants' Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from unemployment and/or tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendants' possession (and/or to which Defendants continues to have access) and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of disclosed Private Information.

234.     Neither Plaintiff nor the other Class Members contributed to the Data Breach.

235.     Plaintiff sent a demand for relief, in writing, to Defendants on June 4, 2024, prior to filing this complaint. Multiple Plaintiffs in consolidated actions have sent[33]—or alleged in their

---

[33] *See, e.g.*, *Ghalem, et al. v. Progress Software Corp., et al.*, 23-cv-12300 (D. Mass.), at ECF No. 1, ¶ 213 ("A demand identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered was mailed or delivered to Defendants at least thirty days prior to the filing of a pleading alleging this claim for relief").

complaints that they would send[34]—similar demand letters as required by M.G.L. c. 93A § 9. Plaintiff has not received a written tender of settlement that is reasonable in relation to the injury actually suffered by Plaintiff and the Class.

236.    Based on the foregoing, Plaintiff and the other members of the Class are entitled to all remedies available pursuant to M.G.L ch. 93A, including, but not limited to, refunds, actual damages, or statutory damages in the amount of twenty-five dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

237.    Pursuant to M.G.L. ch. 231, § 6B, Plaintiff and other Class Members are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct. The amount of damages suffered as a result is a sum certain and capable of calculation and Plaintiff and other members of the Class are entitled to interest in an amount according to proof.

## PRAYER FOR RELIEF

238.    Plaintiff, individually and on behalf of the Classes, respectfully requests that the Court grant the following relief:

---

[34] In all of the following cases (among others), plaintiffs indicated that they were going to send similar demand letters: *Allen, et al. v. Progress Software Corp*., 23-cv-11984 (D. Mass.); *Anastasio v. Progress Software Corp., et al*., 23-cv-11442 (D. Mass.); *Arden v. Progress Software Corp., et al*., 23-cv-12015 (D. Mass.); *Boaden v. Progress Software Corp., et al*., 23-cv-12192 (D. Mass.); *Brida v. Progress Software Corp., et al*., 23-cv-12202 (D. Mass.); *Casey v. Progress Software Corp., et al*., 23-cv-11864 (D. Mass.); *Constantine v. Progress Software Corp., et al*., 23-cv-12836 (D. Mass.); *Daniels v. Progress Software Corp., et al*., 23-cv-12010 (D. Mass.); *Doe v. Progress Software Corp., et al*., 23-cv-1933 (D. Md.); *Ghalem, et al. v. Progress Software Corp., et al*., 23-cv-12300 (D. Mass.); *Kennedy v. Progress Software Corp., et al*., 23-cv-12275 (D. Mass.); *Kurtz v. Progress Software Corp., et al*., 23-cv-12156 (D. Mass.); *McDaniel, et al. v. Progress Software Corp., et al*., 23-cv-11939 (D. Mass.); *Pilotti-Iulo v. Progress Software Corp., et al*., 23-cv-12157 (D. Mass.); *Pulignani v. Progress Software Corp., et al*. , 23-cv-1912 (D. Md.); *Siflinger, et al. v. Progress Software Corp., et al*., 23-cv-11782 (D. Mass.); *Tenner v. Progress Software Corp*., 23-cv-11412 (D. Mass.); *Truesdale v. Progress Software Corp., et al*., 23-cv-1913 (D. Md.).

A.      Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint
        Plaintiff as Class Representative and undersigned counsel as Class Counsel;

B.      Find in favor of Plaintiff and the Classes on all counts asserted herein;

C.      Award Plaintiff and the Class Members monetary damages, including actual
        and statutory, compensatory damages, consequential, nominal, and punitive
        damages, to the maximum extent as allowed by law;

D.      Award compensatory, consequential, general, and nominal damages in an
        amount to be proven at trial;

E.      Award restitution and all other forms of equitable monetary relief;

F.      Award equitable relief enjoining Defendants from engaging in the wrongful
        conduct complained of herein regarding to the misuse or disclosure of the
        private information of Plaintiff and Class members, and from refusing to
        issue prompt, complete, and accurate disclosure to Plaintiff and Class
        Members;

G.      Award injunctive relief as permitted by law or equity to assure that Class
        Members have an effective remedy, and to protect the interests of Plaintiff
        and Class Members, including but not limited to an order:

        1.      requiring Defendants to protect, including through encryption, all
                data collected through the course of their business in accordance
                with all applicable regulations, industry standards, and federal, state,
                or local laws;

        2.      requiring Defendants to delete, destroy, and purge the personal
                identifying information of Plaintiff and Class members unless

Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

3.      requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the private information of Plaintiff and Class Members;

4.      prohibiting Defendants from maintaining the private information of Plaintiff and Class members on a cloud-based database;

5.      requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

6.      requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

7.      requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

8.      requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of

Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

9.    requiring Defendants to conduct regular database scanning and securing checks;

10.   requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate;

11.   requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

12.   requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

13.   requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

14.    requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

15.    requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers;

16.    requiring, for a period of 10 years, the appointment of a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

17.    requiring Defendants to implement multi-factor authentication requirements, if not already implemented;

18.    requiring Defendants' employees to change their passwords on a timely and regular basis, consistent with best practices.

H.    Award disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts;

I.    Award a mandatory injunction requiring that Defendants provide notice to each member of the Classes relating to the full nature and extent of the Data Breach and the disclosure of Private Information to unauthorized persons.

J.    Order Defendants to purchase or provide funds for lifetime credit monitoring and identify theft insurance to Plaintiff and Class embers;

K.      Order Defendants to pay the costs in notifying Class members about the judgment and administering the claims process.

L.      Award Plaintiff and Class Members pre-judgment and post-judgment interest to the maximum extent allowed by law;

M.      Grant Plaintiff and Class Members leave to amend this complaint to conform to the evidence produced at trial;

N.      Award Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses, as allowable;

O.      Distribute any monies recovered on behalf of Class Members or the general public via fluid recovery or *cy pres* recovery where necessary and as applicable to prevent Defendants from retaining benefits of their wrongful conduct;

P.      Award Plaintiff and Class Members such other favorable relief as allowable under law or at equity; and

Q.      Award such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

239.    Plaintiff and Class Members hereby demand a trial by jury on all issues so triable.


Dated: June 11, 2024                             Respectfully submitted,

                                                 */s/ Kristen A. Johnson*
                                                 Kristen A. Johnson (BBO# 667261)
                                                 HAGENS BERMAN SOBOL SHAPIRO LLP
                                                 1 Faneuil Hall Square, 5th Fl.
                                                 Boston, MA 02109
                                                 Tel: (617) 482-3700
                                                 Fax: (617) 482-3003
                                                 kristenj@hbsslaw.com

                                                 *Plaintiff's Liaison & Coordinating Counsel*

E. Michelle Drake
BERGER MONTAGUE, PC
1229 Tyler St., NE, Ste. 205
Minneapolis, MN 55413
Tel: (612) 594-5933
Fax: (612) 584-4470
emdrake@bm.net

Gary F. Lynch
LYNCH CARPENTER, LLP
1133 Penn Ave., 5th Fl.
Pittsburgh, PA 15222
Tel: (412) 322-9243
Fax: (412) 231-0246
Gary@lcllp.com

Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, 5th Fl.
Washington, DC 20005
Tel: (202) 408-4600
dmcnamara@cohenmilstein.com

Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Ste. 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 612-339-0981
khriebel@locklaw.com

Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Ste. 500
Philadelphia, PA 19106
Tel:  (215) 592-1500
Fax: (215) 592-4663
cshaffer@lfsblaw.com

*Plaintiff's Lead Counsel*

Andrea Gold
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW, Ste.1010
Washington, DC 20006

Phone: (202) 973-0900
Fax: (202) 973-0950
agold@tzlegal.com

Emily Feder Cooper
TYCKO & ZAVAREEI LLP
1970 Broadway, Ste. 1070
Oakland, CA 94612
Phone: (202) 973-0900
Fax: (202) 973-0950
ecooper@tzlegal.com

*Plaintiff's Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, the foregoing document was served by filing it on the Court's CM/ECF system, which will automatically send a notification of such filing to all counsel of record via electronic mail.

Dated:  June 11, 2024                              */s/ Kristen Johnson*
                                                  Kristen Johnson